### STATE v. JOHN WILLIAM PIERCE.

*Evidence, exclusion of, what necessary to state on appeal—Preliminary examination of witness, competent to contradict.*

1. Where the contents of a paper, containing the examination of a witness upon a preliminary investigation of an alleged murder, are not set out in the case on appeal, and it appears that error was assigned in excluding it, when offered as evidence to contradict the witness on the trial, as being in itself incompetent whatever might be the contents; *Held,* that the substance of the paper being made known when offered by counsel, satisfies the general rule which requires that the case must show what the rejected evidence was, so that this court may pass upon the exception.

2. Upon a trial for murder, the prisoner introduced the coroner and exhibited a paper to him which he swore contained the examination of a witness taken down by him, and also the preliminary examination reduced to writing by a justice of the peace, for the purpose of contradicting the witness; *Held,* that the exclusion of this evidence was error.

3. The English rule in reference to the use of written memoranda in refreshing memory of witnesses, touched upon, and also that requiring testimony of deceased witnesses to be reproduced in the very words, discussed by SMITH, C. J.

(*State* v. *Clark,* 12 Ired., 151; *Sutliff* v. *Lunsford,* 8 Ired., 318; *Overman* v. *Coble,* 13 Ired., 1; *Whitesides* v. *Twitty,* 8 Ired., 431; *Lee* v. *Patrick,* 9 Ired., 135; *State* v. *Jim,* 3 Jones, 348; *Wright* v. *Stowe,* 4 Jones, 516; *State* v. *Grady,* 83 N. C., 643; *State* v. *King,* 86 N. C., 603; *State* v. *Bridges,* 87 N. C., 562; *Ingram* v. *Watkins,* 1 Dev. & Bat., 442; *State* v. *Williams,* 2 Jones, 257; *Edwards* v. *Sullivan,* 8 Ired., 302; *Ballenger* v. *Barnes,* 3 Dev., 460; *Jones* v. *Ward,* 3 Jones, 24, cited and approved.)

INDICTMENT for murder tried at January Special Term, 1884, of IREDELL Superior Court, before *Graves, J.*

Verdict of guilty, judgment, appeal by prisoner.

*Attorney-General,* for the State.

*Messrs. D. M. Furches, Armfield* and *Linney,* for the prisoner.

SMITH, C. J. The prisoner is charged with the crime of murder committed upon the body of James A. Moore, and upon his trial before the jury was found guilty.

The record shows numerous exceptions to the ruling of the court made during the progress of the trial, one only of which do we find it necessary to consider.

Two witnesses, present at the time of the homicide and who give a minute account of what occurred, (the prisoner's wife and an elder sister, both daughters of the deceased) were examined and testified at great length, whose respective statements of the transaction do not agree in some essential particulars touching the grade of the offence, and the circumstances under which the fatal shot was fired, and the crushing blow upon the head, immediately following, given, and hence it became material to the prisoner to sustain the accuracy of the testimony of the wife in his behalf, and to impair the force of that delivered by the other, on behalf of the state.

The occurrence took place at the house of the deceased on the evening of the 26th day of July, 1883, in the presence of the witnesses and their invalid mother, who was lying upon a bed in the room, and of no other persons.

From the testimony of Mary Moore, the elder unmarried daughter, who details minutely the conduct of the parties and the words which passed between them leading up to the homicide, which it is needless to recapitulate for any present purpose, it appears that the deceased was very drunk, and some cursing between him and the prisoner who had also partaken of whiskey at the house, had been heard, which prompted the witness to ask if they intended to have a fuss, and both answered they did not.

The witness stated that some trouble occurred between the prisoner and his wife, when the prisoner said that he could not make Minnie (the name of his wife) behave, to which the deceased replied, that he could, and taking hold of her flung her over on the bed on which her mother was lying, when witness said, " you will kill mother, be quiet;" he desisted, replying, " I will."

The prisoner then passed up stairs, when the deceased directed witness to shut the door and window, remarking that the prisoner had gone after his satchel and should not leave that night. This was done. The prisoner came back, and standing on the 4th or 5th step from the bottom while Minnie was sitting on the stairs, the deceased about a step from them, and witness engaged in administering medicine to her mother, she heard the prisoner say, " See here, old man, you can't run over Minnie any longer," when turning, she saw the prisoner discharge a pistol at deceased, who then had Minnie by the arm.

At the moment of firing, the deceased turned in the direction of his gun, when the prisoner advancing struck him a crushing blow on the head with the pistol, with such violence as in the witness' own words " burst his head open." When the blow was struck the deceased was facing the prisoner, with his back towards the gun.

The blaze of the pistol was so near the person of the deceased as to set his shirt on fire, and putting his hand over it, he turned towards the prisoner with the exclamation, " Oh, Bill !" when he received the blow and fell on his knees with his head on the stair step. He died immediately.

The version of the matter given by the prisoner's wife was quite different and much more favorable to her husband. To support her testimony and to impair the force of that delivered by her sister, the prisoner's counsel introduced J. A. Anderson, the coroner, and exhibited to him a paper which he swore contained the examination of the

witness Mary, committed to writing by himself, and read oves to her and a mark in place of her name put to it. . He further swore that he wrote down all that she said and nothing that she did not say.

The prisoner's counsel also introduced the examination of the same witness before the justice who conducted the preliminary hearing, and proved by his oath that this paper contained the testimony of the same witness reduced to writing, not read over to her, nor does he know that she authorized him to sign her name to it.

The counsel, stating that these examinations differed from the present testimony given in, in regard to the homicide and the incidents preceding and attending it, proposed to read them to the jury to contradict and impeach the credit of the witness, but was not allowed to do so, the court holding them incompetent. To this ruling the prisoner excepts.

We have felt some hesitancy in passing upon this exception, since the contents of the excluded papers are not set out and made part of the case.

The general rule undoubtedly is that an exception to the refusal to receive offered evidence will not be sustained unless the record shows what it was, so that the court could decide upon its relevancy and misleading tendency. *Overman* v. *Coble,* 13 Ired., 1.

The rule is equally applicable to evidence objected to and received where error is assigned in its admission. *State* v. *Clark,* 12 Ired., 151; *Sutliff* v. *Lunsford,* 8 Ired., 318; *Whitesides* v. *Twitty, Ib.,* 431.

So it has been held in *Lee* v. *Patrick,* 9 Ired., 135, that when the defendant proposed to show the witness, for the purpose of refreshing his memory of facts, a certain notice, and was not permitted to do so, to which ruling exception was taken, that the judgment could not be reversed for that reason, as the case did not set forth the notice so as to en-

39

able the court " to see that its contents were such as were calculated to have the effect proposed."

But our doubts have been resolved by the fact that the substance of the papers were made known when offered by counsel, and they were excluded as in themselves incompetent, whatever might be their contents. The ruling is more analagous to the case of a witness produced and excluded in consequence of his personal disability to testify, and without reference to the evidence he may give. In such case the error is assigned in the exclusion, and it is not necessary to set out what he was expected to prove. *State* v. *Jim*, 3 Jones, 348; *Wright* v. *Stowe*, 4 Jones, 516.

The refusal of the court to allow the jury to hear the examinations seems to stand on very much the same basis as the rejection of a witness who is adjudged to be disqualified to testify at all in the cause, and if this be not so, the nature and use to be made of the evidence were made known to the court at the time, sufficiently to warrant us in entertaining the exception.

Had the examinations been offered as substantive evidence bearing upon the criminal charge, they would have been properly rejected, since, if offered by the state, they are only admissible under the statute, when taken according to its requirements, if at the time of the trial the witness be dead, or too ill to travel, or of unsound mind, or absent by the procurement or connivance of the accused. THE CODE, § 1157.

The same conditions, except that resting upon the defendant's own misconduct in keeping the witness away, underlie his right to offer the testimony. *State* v. *Grady*, 83 N. C., 643; *State* v. *King*, 86 N. C., 603; *State* v. *Bridgers*, 87 N. C., 562.

The evidence was not tendered for such object, but as declarations of the witness made under the sanction of an oath contradicting her present testimony and disparaging

her credit. The life of the prisoner may have been suspended upon the repugnancy of the narratives of the transaction as given by the sisters, and the credibility of the witnesses was a material element involved in the conclusion to which the jury were brought in rendering the verdict.

There is a difference in the accuracy required in reproducing the testimony of a deceased witness given on a former trial, as a substitute for it, and the memory required in recalling conflicting statements made elsewhere, which is thus stated by GASTON, J., in *Ingram* v. *Watkins*, 1 Dev. & Bat., 442 :

" The testimony of the deceased witness should be placed before the new, as the law required it to be placed before the former triers. Both are entitled not only to the truth, but to the whole truth. The copy must be ascertained to be faithful, before it is admitted as a representative of the original. * * To impeach a witness' credit, one clear and advised cantradiction in this respect is sufficient, since it is the rule of law as of good sense, that he who falsifies himself in one point is undeserving of belief in all, *falsus in uno falsus in omnibus.* No more therefore of the witness' former declaration is necessary to be heard, than what is charged to be repugnant to his present statement." *Wright* v *Stowe, supra ; Edwards* v. *Sullivan*, 8 Ired., 302 ; as a rule of law modified in *State* v. *Williams*, 2 Jones, 257, and other cases.

Even, however, in the former case, it is sufficient if the witness can state the substance of all the deceased witness swore, and it is not necessary that he should repeat the very words. *Ballenger* v. *Barnes*, 3 Dev., 460 ; *Wright* v. *Stowe, supra.*

In *Jones* v. *Ward*, 3 Jones, 24, an attorney who had taken notes of the testimony of a deceased witness on a previous trial, but had no recollection of it independently of the

notes, when he swore to their correctness, was allowed to introduce them in evidence.

The same ruling was made by SAVAGE, C. J., in *Clark* v. *Vorce*, 15 Wend., 195. Much more confidence should be reposed in the accuracy of a memorandum of the very words as they fell from the lips of the witness, than in a writing contemporaneously made of passing events.

The objection to these papers rests upon the idea that they are offered as such, and not as a means of refreshing the memory of the witnesses who testify in regard to them. They do not prove themselves, but rest upon the testimony of those officers of the law. The production of the writings is required where the witness remembers having seen the writing before, and though he has no independent recollection of the facts mentioned in it, yet he remembers that, at the time he saw it, he knew the contents to be correct. 1 Greenl. Evi., § 437.

The purpose here is not to prove any facts sworn to, but what were the declarations made by the witness—what did she then say—what was her version of the matter. What higher proof could be had than her very words written down as they were uttered with care and under a sense of official obligation.

We are aware that the rule in England is very stringent in reference to the use of written memorials in reviving a failing memory of past occurrences, and confining them to that purpose.

Referring to the doctrine that requires the testimony of a deceased witness to be reproduced in his very words, GIBSON, J., remarks in *Smith* v. *Lane*, 12 S. & R., 84, " To do this would require a memory which seldom falls to the lot of any one: * * * But this absurdity has been exploded by this court, and in this state it is unnecessary to profess to use the language of a deceased witness, but only to

undertake to state the substance of all he swore in relation to the particular transaction.

In *Heeran* v. *Wendell*, 11 N. H., 112, the memorandum was received in connection with a witness' oath, that he heard certain matters—that he made a memorandum of those matters—that this is that paper—and that it is a true statement of what then occurred. PARKER, C. J., remarking that the memorandum then becomes part of the *testimony of the witness*, and the question is whether the paper itself may be received to show the particulars of what then occurred, the witness testifying that he now has no recollection of all the particulars, but he has no doubt the facts there stated are true, and that he should, within a short time subsequent, have sworn to them from recollection. To same effect is *State* v. *Rawls*, 2 N. & Mc., (S. C.) 331.

Our conclusion, therefore, is that error was committed in ruling out the examinations as impeaching evidence, which entitles the prisoner to another jury.

While it is of the highest moment to the well-being of society that the violated law should be vindicated in the punishment of crime, it is not less so to preserve inviolate those rules and methods which the law has prescribed to secure a fair trial of one accused, and which has the sanction of ages. The verdict must be set aside, and a *venire de novo* awarded, and to this end it will be certified to the superior court of Iredell.

Error. *Venire de novo.*